IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 07-cv-02181-WYD-BNB
(consolidated with 08-cv-01218-WYD-BNB)

EXCEL-JET, LTD., a Colorado corporation,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.
_____

**ORDER**
_____

This matter arises on plaintiff's **Motion to Disqualify George C. Greene as an Expert Witness for Defendant** [Doc. # 52, filed 2/2/2009] (the "Motion to Disqualify"). The Motion to Disqualify and the United States' Opposition [Doc. # 57, filed 2/17/2009] (the "Response") are supported by extensive affidavits and evidence. In addition, I held a hearing on the Motion to Disqualify on February 23, 2009, see Transcript of Proceedings [Doc. # 63, filed 3/12/2009] ("Trans."), at which time I received additional evidence, although no witnesses were called to testify.

The Motion to Disqualify is GRANTED as specified below.

I.

This is an action against the United States pursuant to the Federal Tort Claims Act. Complaint [Doc. # 1] at ¶1. It concerns the crash of a Sport-Jet prototype aircraft at the Municipal Airport in Colorado Springs, Colorado. Scheduling Order [Doc. # 17] at Part 3.a. The plaintiff alleges:

> Plaintiff Excel-Jet, Ltd. claims that air traffic controllers acting as
> agents and employees of Defendant [United States] negligently
> and carelessly breached their duties to Plaintiff by, *inter alia*,
> failing to adequately follow established FAA ATC procedures
> relating to wake turbulence and flight separation. As a direct and
> proximate result of the negligence and carelessness of the air
> traffic controllers, for which Defendant is liable, Plaintiff claims to
> have suffered property losses and economic damages including
> loss of Plaintiff's single prototype aircraft, diminution in the value
> of Plaintiff's business, and loss of future sales and profits.

Id. The allegation about "flight separation" is more fully explained in the Complaint:

> The air traffic controllers cleared N350SJ [the plaintiff's aircraft]
> for takeoff on runway 17R, from an intersection upon the runway,
> after departure of the Dash 8, in violation of the Air Traffic
> Control Manual.
>
> \* \* \*
>
> The N350SJ weighed approximately 3,450 pounds at the time of
> departure and was classified as a small aircraft under the Air
> Traffic Control Manual, FAA Order 7110.65 ("ACTM").
>
> The Dash 8 air shuttle is classified as a large aircraft under the
> ACTM.
>
> Regarding flight separation for intersection departures, the ACTM
> provides the following:
>
>> Separate a small aircraft taking off from an
>> intersection on the same runway (same or opposite
>> direction of takeoff) behind a preceding departing
>> large aircraft by ensuring that the small aircraft does
>> not start takeoff roll until at least 3 minutes after the
>> large aircraft has taken off.

Complaint [Doc. # 1] at ¶¶10, 14-16.

George C. Greene, the expert at issue in this motion, is reported to be a leading authority in the area of wake turbulence. Response at p.14. He has more than 25 years experience with the National Aeronautics and Space Administration ("NASA") and with the Federal Aviation Administration ("FAA"). Declaration of George C. Greene [Doc. # 58] ("Greene Decl.") at ¶¶2-

5. Dr. Greene retired from the FAA on December 1, 2006. Id. at ¶4.

The plaintiff claims that it contacted Dr. Greene in August 2007, and through a series of communications engaged him to serve as its expert. The plaintiff claims that it communicated confidential information to Dr. Greene concerning the accident and this case. Shortly before a litigation team meeting on January 8, 2008, Dr. Greene terminated his engagement with the plaintiff. Subsequently, the plaintiff was surprised to see on January 23, 2009, that the United States had endorsed Dr. Greene to provide expert testimony concerning wake turbulence. The plaintiff seeks Dr. Greene's disqualification as an expert for the United States arguing that "[d]ue to the prior engagements between Plaintiff and Greene, this endorsement is clearly improper. . . ." Motion to Disqualify at p.3.

## II.

Federal courts have the inherent power to disqualify expert witnesses to protect the integrity of the adversary process, protect privileges that otherwise might be breached, and promote public confidence in the legal system. English Feedlot, Inc. v. Norden Laboratories, Inc., 833 F. Supp. 1498, 1501 (D. Colo. 1993); Hewlett-Packard Co. v. EMC Corp., 330 F. Supp. 2d 1087, 1092 (N.D. Calif. 2004). Accord Larson v. Rourick, 284 F. Supp. 2d 1155, 1156 (N.D. Iowa 2003)(stating that the inherent power to disqualify experts "derives from the necessity to protect privileges which may be breached when an expert switches sides" and to "preserve public confidence in the fairness and integrity of judicial proceedings"). Disqualification of an expert is warranted where the party seeking disqualification can show both prongs of a two-part test: (1) that it had an objectively reasonable belief that it had established a confidential relationship with the expert, and (2) that it disclosed confidential information to the expert.

English Feedlot, 833 F. Supp. at 1502. As the court explained in Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, L.L.C., 202 F.R.D. 426, 429 (E.D. Penn. 2001):

> If the answers to both inquiries are affirmative, a court should disqualify the expert. However, disqualification is likely inappropriate if either inquiry yields a negative response. Thus, generally, disqualification should not occur where a confidential relationship existed but no privileged information was communicated or . . . where no confidential relationship existed but privileged information was nonetheless disclosed.

(Internal citations and quotations omitted.)

In addition, a court ruling on a motion to disqualify "also should consider whether disqualification would be fair to the affected party and would promote the integrity of the legal system." Hewlett-Packard, 330 F. Supp. 2d at 1093.

The party seeking to disqualify the expert bears the burden of proof. English Feedlot, 833 F. Supp. at 1501-02. The burden is not satisfied by "mere conclusory or *ipse dixit* assertions." Greene, 202 F.R.D. at 429.

### III.

A confidential relationship may be established in a number of ways. This court has previously stated for purposes of guidance:

> [C]ostly litigation of collateral issues concerning expert disqualification can be avoided. First, a lawyer seeking to retain an expert and establish a confidential relationship should make this intention unmistakably clear and should confirm it in writing. The writing should define clearly the consultant's confidentiality obligation. If a consultant does not want to be bound by such confidentiality requirement, he should decline the engagement. Similarly, counsel seeking to retain a consultant should inquire specifically whether the consultant's past employment presents any confidentiality problems.

English Feedlot, 833 F. Supp. at 1505.

Similarly, in Wang Laboratories, Inc. v. Toshiba Corp., 762 F. Supp. 1246, 1248-49 (E.D. Va. 1991), the court held:

> Lawyers bear a burden to make clear to consultants that retention and a confidential relationship are desired and intended. Fairness requires this. Fairness also requires that consultants with doubts about their desire to be retained should express these doubts clearly and unequivocally to the inquiring lawyer and decline to accept any disclosures unless and until the doubts are resolved.

Applying this standard, the court noted that the plaintiff's lawyer (Thomas Scott) sent several letters to the disputed expert (John Balde) and, based on those letters, the court disqualified the expert finding:

> [T]he November 14 and 15 letters, though neither is entirely free from ambiguity, are both plainly consistent with Scott's sworn assertion that he considered he had retained Balde and that a confidential relationship existed. The amount and nature of the materials included with the letters furnish additional support for this conclusion. The letters informed Balde of the case issues and identities of the parties involved. Significantly, the November 15 letter was prominently labeled as confidential. Balde's silence in the face of receiving this information reenforces the reasonableness of Scott's assumption that a confidential relationship existed.

Id. at 1249.

The court had no difficulty finding the existence of a confidential relationship in Cordy v. Sherwin-Williams Co., 156 F.R.D. 575, 581 (D.N.J. 1994), on the following facts:

> Green [the disputed expert] performed services for Brown & Connery [plaintiff's counsel]. He entered into a written contract. He was paid. He learned their litigation strategy and reviewed their investigation. He billed for 28 hours of work. He rendered some kind of oral opinion. There was extensive contact between Green and Brown & Connery. Their relationship was clearly not a preliminary interview or consultation in order to determine whether an attorney desired to enter into a relationship with an expert.

The Cordy court cautioned, however, that "there is no 'right' way for an attorney to retain an expert for purposes of litigation," and refused to adopt the "formalistic rituals suggested in Wang. . . ." Id.

In Larson v. Rourick the court applied the following test to determine whether there was an objectively reasonable belief that a confidential relationship existed:

> In determining whether it was objectively reasonable for the first party who claims to have retained the expert to conclude that a confidential relationship existed, the courts have found such a relationship to exist when the record supports a long-standing series of interactions, which have more likely than not coalesced to create a basic understanding of the retaining party's modus operandi, pattern of operations, decision-making process, and the like. Where the expert met once with counsel, was not retained, was not supplied with specific data relevant to the case, and was not requested to perform any services, courts have found that the evidence supports the finding that the meeting was a type of informal consultation rather than the commencement of a long-term relationship.

284 F. Supp. 2d at 1156-57 (internal citations omitted).

The court in Hewlett-Packard articulated the following multi-factor analysis:

> In evaluating the reasonableness of the party's assumption [of the existence of a confidential relationship], the Court may consider many factors including whether the relationship was one of long standing and involved frequent contacts instead of a single interaction with the expert, whether the expert is to be called as a witness in the underlying case, whether alleged confidential communications were from expert to party or vice-versa, and whether the moving party funded or directed the formation of the opinion to be offered at trial. Other factors include whether the parties entered into a formal confidentiality agreement, whether the expert was retained to assist in the litigation, the number of meetings between the expert and the attorneys, whether work product was discussed or documents were provided to the expert, whether the expert was paid a fee, whether the expert was asked to agree not to discuss the case with the opposing parties or counsel, and whether the expert derived any of his specific ideas from work

> done under the direction of the retaining party. The emphasis . . .
> is not on whether the expert was retained per se but whether there
> was a relationship that would permit the litigant reasonably to
> expect that any communications would be maintained in
> confidence.

330 F. Supp. 2d at 1093 (internal quotations and citations omitted).

Initially, I must determine whether the plaintiff had an objectively reasonable belief that it had formed a confidential relationship with Dr. Greene. I find, based on the facts presented to me, that it did.

Robert Bornhofen is the founder of Excel-Jet, the plaintiff here. Motion to Compel, Exh. A [Doc. # 52-2] Affidavit of Robert Bornhofen ("Bornhofen Aff.") at ¶1. The evidence establishes that the Mr. Bornhofen first contacted Robert Ash for assistance. Mr. Ash directed him to George Greene, stating in an e-mail dated August 30, 2007:

> The person who would be your best "expert" is George Greene.
> He has been used in a number of airplane accidents involving wake
> vortices and he has retired from NASA and from the FAA.

Response, Exh.2 [Doc. # 58-2] at p.11 of 23.[1]  Mr. Ash subsequently contacted Dr. Greene by e-mail, dated August 31, 2007, stating:

> I got the e-mails below from Bob Bornhofen, starting a couple of
> days ago. I thought he was a lawyer working on a wave vortex
> accident. However, it turns out that he is the founder of Excel Jet,
> and the jet they are trying to develop apparently had an encounter
> with a Dash 8 wake vortex. . . . I suggested that Bob contact you
> and if you are interested in helping him, that is your call.

Id. at p.10 of 23.

Dr. Greene called Mr. Bornhofen in the afternoon of August 31, 2007. Greene Decl.

---

[1] Citations to the exhibits are to the page numbers assigned by the court's CM/ECF system.

[Doc. # 58] at ¶¶14-15. The telephone call was followed by an e-mail from Dr. Greene to Mr. Bornhofen where Dr. Greene stated that he had "enjoyed the chat"; provided Mr. Bornhofen with the name of a meteorologist to consult on weather conditions; provided his own contact information; and requested that Mr. Bornhofen "send me the link to the NTSB report and anything else you have electronically." Response, Exh. 3 [Doc. # 58-2] at p.18 of 23.

On August 31, 2007, at approximately 5:35 p.m., Mr. Bornhofen sent Dr. Greene another e-mail, stating "[l]et me describe again the info on what happened," and providing a detailed description of the events surrounding the crash. The e-mail concluded: "I would like to keep your work under-wraps until I learn what really happened." Response, Exh. 6 [Doc. # 58-3] at pp.11-12 of 24.

Mr. Bornhofen and Dr. Greene had additional e-mail contact on September 4, 2007. Among other things, Mr. Bornhofen told Dr. Greene about his theory of the crash:

> FYI--we are checking the tower tape but don't assume the SportJet was 1.5 minutes behind the Dash 8. We were given clearance for takeoff 1.5 minutes after the Dash 8. The Dash 8 would have had to taxi across Runway 12 and then back taxi to the start of 17. Still checking the actual radar data but it could have taken the Dash 8 about 20+ seconds or more to get into takeoff position. That would reduce the time between aircraft takeoff rolls.

Response, Exh. 8 [Doc. # 58-4] at p.2 of 14.

On September 7, 2007, one of the plaintiff's lawyers (Frank Coppola) sent an e-mail to Dr. Greene stating:

> As you may know, I represent Bob Bornhofen and his company with regard to a crash which occurred in Colorado Springs. I believe you spoke to Bob yesterday. We are interested in talking to you about consulting with us on this case. Please call me, or provide me with a convenient time for me to call you. Thank you for your consideration.

8

Response at Exh. 9 [Doc. # 58-4] at p. 9 of 14.

On September 9 and 12, 2007, Dr. Greene communicated with the plaintiff's test pilot. Greene Decl. [Doc. # 58] at ¶¶37-39.

On October 15, 2007, Mr. Coppola sent an e-mail to Dr. Greene indicating that he was "sending some info to you today to review regarding the SportJet crash in Colorado Springs," and indicating an intention to discuss the information with him. Response, Exh. 13 [Doc. # 58-5] at p. 4 of 14. Dr. Greene and Messrs. Bornhofen and Coppola had a 15 to 20 minute telephone conversation on October 16, 2007.[2] According to Dr. Greene the men discussed the following:

> [The plaintiff's] ongoing efforts to gather certain factual or technical information, such as wind, radar and weather information at the time of the accident. They further explained that they were lining up people to do certain computational work of wake turbulence, including propeller swirl, or "prop wash."

Greene Decl. [Doc. # 58] at ¶52.

On November 1, 2007, Dr. Greene sent an e-mail to the plaintiff containing some initial opinions about the accident:

> I read the NTSB report and wake study you sent. Basically the NTSB did two studies, one with the winds as reported and one with winds needed to force a wake encounter. **IF the met data they used is correct** for reported conditions, it would be hard to have a wake encounter. If the conditions they used to force a wake encounter are correct, the wake could be stronger than their estimates. As I said earlier, getting the right met data is a key to understanding all of this. Feel free to call me on my cell if you have any questions.

Response, Exh. 16 [Doc. # 58-5] at p.10 of 14 (original emphasis). This e-mail was followed by

---

[2]Suit was commenced on October 16, 2007, by the filing of the Complaint.

a 15 minute telephone call between Dr. Greene and Mr. Bornhofen. Greene Decl. [Doc. # 58] at ¶¶62-63.

Mr. Coppola sent an e-mail to Dr. Greene on December 3, 2007, setting a meeting for January 8, 2008, in Mr. Coppola's Denver office. Response, Exh. 18 [Doc. # 58-5] at p.14 of 14. Dr. Greene was on vacation and did not see the e-mail until December 15, 2007. Greene Decl. at ¶76. According to Dr. Greene:

> I had no idea what meeting Mr. Coppola was referring to and thus called him at my first opportunity for an explanation.
>
> Mr. Coppola said it was a "team meeting" for a lawsuit. When I asked what lawsuit, Mr. Coppola said Excel-Jet was suing the United States.
>
> This was the first time that I had heard of a lawsuit. I responded I did not understand how there could be a lawsuit because Excel-Jet (in my view) did not know what caused the accident. I stated, however, that I could not help them with a lawsuit against the United States.

Id. at ¶¶77-79.

Dr. Greene was contacted by counsel for the United States in March 2008 and "retained . . . as a wake turbulence expert in this matter." Id. at ¶82.

First, I find that the plaintiff made clear and unmistakable its intention to establish a confidential relationship with Dr. Greene and confirmed that intention in writing. Mr. Ash's August 30 e-mail, forwarded to Dr. Greene on August 31, speaks in terms of the plaintiff's need for an expert. In another e-mail dated August 31, Mr. Bornhofen described the details of the accident and stated clearly that it was his intention that the relationship with Dr. Greene should be confidential, explaining that he "would like to keep your [Greene's] work under-wraps until I learn what really happened." Response, Exh. 6 [Doc. # 58-3] at p. 12 of 24. Dr. Greene never

objected to the confidential relationship requested by Mr. Bornhofen, and he accepted and reviewed information and materials after being told that Mr. Bornhofen viewed the relationship as confidential.

Second, there is no indication that Dr. Greene objected to Mr. Coppola's request that he serve as a consultant for Mr. Bornhofen and his company "on this case." After that request, Dr. Greene had further contacts with Mr. Coppola and his client, including a 15 to 20 minute telephone conversation concerning the status and nature of the plaintiff's investigation into the cause of the crash. Significantly, although it was apparent that the plaintiff blamed air traffic control (and thus the United States) for the crash,[3] Dr. Greene failed to disclose that he was working at that time as an expert for the United States in other cases. Declaration of Robert Gross, Exh. 3 [Doc. # 59-2] ("Greene Expert Report") at p. 43 of 50 (Part 9.0).

Third, Dr. Greene had extensive contacts with Mr. Bornhofen, other representatives of Excel-Jet, and Mr. Coppola concerning the case. Those contacts go far beyond "a preliminary interview or consultation" to determine whether to retain an expert. See Cordy, 156 F.R.D. at 581. In addition, Dr. Greene had a prolonged relationship with the plaintiff and its lawyer, from August 31 through December 15, 2007.

Fourth, it is apparent that Dr. Greene's opinions were requested by the plaintiff, and in his e-mail dated November 1, 2007, Dr. Greene gave at least a preliminary opinion concerning his views of the case. See Response, Exh. 16 [Doc. # 58-5] at p. 10 of 14.

There is no evidence, however, that Dr. Greene was paid a fee, entered into a written

---

[3]See Bornhofen's 9/4/2007 e-mail to Greene, Response at Exh. 8 [Doc. # 58-4] at p. 2 of 14.

engagement agreement, or billed any time to the plaintiff.

Based on these facts, I find that the plaintiff held an objectively reasonable belief that it had established a confidential relationship with Dr. Greene.

Dr. Greene and the United States emphasize that Dr. Greene was not aware of the existence of litigation until his telephone call with Mr. Coppola on approximately December 15, 2007. The contemplation or existence of litigation is not required. The plaintiff reasonably believed that it had entered into a confidential relationship with Dr. Greene, and Dr. Greene did nothing to discourage that understanding. Once he learned that the matter was in litigation, Dr. Greene certainly was free to discontinue his services for the plaintiff. He was not thereafter necessarily free to switch sides and act as an expert for the United States, however.

IV.

The second prong of the two-part test requires that the plaintiff establish that it disclosed confidential information to the expert. I find that the plaintiff has satisfied this requirement, as well.

Dr. Greene acknowledges a 15 to 20 minute telephone call with Mr. Bornhofen and his lawyer on October 16, 2007, the day suit was filed. Mr. Coppola described his conversations with Dr. Greene as follows:

> During his consultations with Excel-Jet, Ltd., Greene was made privy to my assessment of the crash of the N350SJ, my views regarding potential defenses in this case, my theory of the case, and my mental impressions and strategies.
>
> Issues discussed between myself, my client, and Greene included the possibility/probability of wake turbulence being a factor in the crash of N350SJ, the NTSB's methods for analyzing wake turbulence, the inadequacies and shortcomings of the NTSB's methods, and research regarding the decay rate of wing tip

vortices.

Motion to Disqualify, Exh. B [Doc. # 52-3] Affidavit of Frank W. Coppola ("Coppola Aff.") at ¶¶ 6-7. Significantly, although Dr. Greene describes the content of the conversations differently and in more factual terms,[4] he does not dispute that Mr. Coppola disclosed his assessment of the crash; his views regarding potential defenses in the case and the inadequacies and shortcomings in the NTSB's methods for analyzing wake turbulence; research regarding the decay rate of wing tip vortices; and his mental impressions, strategies, and theory of the case. This is confidential information. Hewlett-Packard, 330 F. Supp. 2d at 1094 (stating that confidential information "could include discussion of the party's strategy in the litigation, the kinds of experts [the party] expects to retain, [the party's] view of the strengths and weaknesses of each side, the role of each of the [party's] experts to be hired and anticipated defenses" (internal quotations and citations omitted)).

V.

Finally, I must consider whether disqualification would be unfair to the affected party, here the United States, and would promote the integrity of the legal system. Hewlett-Packard, 330 F. Supp. 2d at 1093. I find that disqualification of Dr. Greene would not be unfair and will promote integrity.

---

[4]Dr. Greene states that the conversation concerned the following:

> [The plaintiff's] ongoing efforts to gather certain factual or technical information, such as wind, radar and weather information at the time of the accident. They further explained that they were lining up people to do certain computational work of wake turbulence, including propeller swirl, of "prop wash."

Greene Decl. [Doc. # 58] at ¶52.

Dr. Greene states that before he was engaged by the United States as its expert he disclosed to its lawyer the details of his prior dealings with the plaintiff. Greene Decl. [Doc. # 58] at ¶¶82-83. Thus, the Motion to Disqualify does not come as a surprise. Even though it was aware of Dr. Greene's prior relationship with the plaintiff, the United States waited nearly one year, until January 2009 when it made its expert disclosures, to reveal that it would use Dr. Greene as its expert.[5] Under these facts, the United States was aware of the risk it ran in utilizing the services of Dr. Greene, and there is no unfairness to the United States in disqualifying its expert.

This is a classic case of an expert switching sides after a long-standing relationship and after obtaining confidential information. The integrity of the legal system requires disqualification under these facts.

As relief, the plaintiff seeks "an order disqualifying George C. Greene as an expert witness for Defendant and prohibiting counsel for Defendant from using any information obtained from Greene in the defense of this case." Motion to Disqualify at p.1. The plaintiff has made the necessary showing to disqualify Dr. Greene, and I will order it. The plaintiff has failed to specify the "information obtained from Greene" and tainted by his prior relationship with the plaintiff, however, and I decline to impose a limitation on the information the United States may use.

IT IS ORDERED that the Motion to Disqualify is GRANTED. The United States may

---

[5]Dr. Greene was retained as the United States' expert in March 2008. Greene Decl. [Doc. # 58] at ¶82. The plaintiff states that it was not informed of this fact until "shortly before Defendant's deadline for expert disclosures" on January 23, 2009. Motion to Disqualify at pp.5-6.

not call Dr. Greene as an expert witness at trial or otherwise rely on his opinions. The Motion to Disqualify is otherwise denied.

Dated May 1, 2009.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge